**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ANTOINE FOSTER,**<br><br>**Defendant.** | **Case No. 26-cr-65-RDM** |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION FOR DEFENDANT ANTOINE FOSTER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion that Defendant Antoine Foster be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) (Crime of Violence) 18 U.S.C. § 3142(f)(1)(E) (Firearm/Other Dangerous Weapon) of the Bail Reform Act.  In addition, the charged offenses trigger a rebuttable presumption of detention under 18 USC § 3142(e)(3), as they involve the use of firearms in connection with violent criminal conduct. That presumption squarely applies here and is not rebutted—indeed, it is reinforced by Antoine Foster's actions and those of his co-defendants on March 23, 2026.  Accordingly, it is presumed that no condition or combination of conditions will reasonably assure the safety of the community or the defendants' appearance as required.

The facts of this case confirm that detention is not just warranted, but necessary to protect the community. On March 23, 2026, Antoine Foster and his co-defendants planned and successfully ambushed an officer of the United States Park Police, unloading an AR-15 rifle and a 9mm pistol towards the Park Police officer as he desperately sought to escape the hail of gunfire unleashed by the defendants.  The use of an AR-15, a high-velocity, military style weapon designed

1

to inflict catastrophic damage, combined with the coordinated gunfire directed by the defendants at the Park Police officer, underscores the extreme danger the defendants pose to law enforcement and the public alike.

Considering the factors specified under 18 U.S.C. § 3142(g), there is no condition or combination of conditions that will reasonably assure Antoine Foster's appearance in court and the safety of any other person and the community. Accordingly, the defendant should be ordered detained pending trial.

## BACKGROUND

On March 23, 2026, R.M., a member of the United States Park Police, was conducting surveillance related to a March 20th, 2026, shooting at an Eid Celebration in the District of Columbia. Video surveillance identified defendant Asheile Foster as a person of interest, capturing him appearing to have a firearm at the scene of the shooting. The day before, on March 22, 2026, members of the United States Park Police, including R.M., had arrested Asheile Foster for trafficking fentanyl and other controlled substances. R.M. surveilled Asheile Foster as traveled from the U.S. Park Police Anacostia Operations Facility to 5046 Queens Stroll Place SE Washington D.C., the defendants' residence—confirming Asheile Foster's connection to the location that would shortly become the site of a violent ambush.

Just prior to 7:30 p.m., Darren Foster and Antoine Foster took up positions in front of 5046 Queens Stroll Place SE. Both defendants were armed—Darren Foster with a 9mm pistol and Antoine Foster with an AR-15 style assault rifle—while they waited to ambush R.M. when his vehicle, a white Tesla, arrived in the block. At approximately 7:30 p.m., defendant Asheile Foster, together with his brother, defendant Darren Foster, unleashed a barrage of approximately 32 rounds at the intersection of Queens Stroll Place SE and 51st Street SE, Washington, D.C,

targeting R.M. as he attempted to flee and save his life.  One of those rounds pierced R.M. in the left shoulder. Despite being shot, R.M. radioed, "Shots fired" and "I'm hit but I am good" as he drove himself to safety near Benning Road and Hillside Road SE, bleeding from his gunshot wound.

The defendants' gunfire riddled the vehicle, striking multiple points, including the rear bumper and trunk, the rear driver's side door and window, and the driver's door itself. The sheer volume and dispersion of the gunfire underscore the calculated and sustained nature of this attack, and the extraordinary fact that R.M. survived. This was not reckless gunfire. The defendants were shooting to kill.

The crime scene silently spoke to the extreme violence associated with this ambush by gunfire. Numerous shell casings were in the street near 5046 Queens Stroll Place. Twenty-three .300 Blackout shell casings and nine 9mm casings were recovered in this residential street in the sixth district which was less than 1000 feet away from the C.W. Harris Elementary School-placing the surrounding community directly in harm's way.

Responding officers located a black backpack wedged between the rear fence of 5046 Queens Stroll Place SE and a fence leading to the rear alley. Inside was a stolen AR-15 rifle-style firearm, which after being test fired by law enforcement was presumptively linked to the .300 Blackout shell casings recovered at the crime scene.  At 7:51 pm, law enforcement cleared 5046 Queens Stroll Place SE and continued to hold the location in anticipation of a search warrant.

Surveillance footage from an MPD crime camera located at 51st and Queens Stroll Place SE captured the complete story of what happened on March 23.  Prior to the ambush, an individual wearing a black jacket or sweatshirt with a white striped down both sleeves and black

pants with a white stripe down both pant legs, later identified as defendant Darren Foster, was

observed standing in front of 5046 Queens Stroll Place SE.



*Figure 1: Still image from surveillance video of the individual wearing a black jacket or sweatshirt with a white stripe down both sleeves and black pants with a white stripe down both pant legs (subsequently identified as Darren FOSTER) standing in front of 5046 Queens Stroll Place SE.*

A few seconds later, a second individual emerged from the area of the front door of 5046

Queens Stroll Place SE wearing what appears to be a reddish/brownish in color jacket or

sweatshirt and reddish/brownish pants—further confirming coordinated activity at the scene.

That individual was subsequently identified by law enforcement as Antoine Foster.



7:29:57.590 PM 3/23/2026

*Figure 2: Still image from surveillance video of the individual wearing* a reddish/brownish in color jacket or sweatshirt and reddish/brownish pants *(subsequently identified as Antoine FOSTER) standing in front of 5046 Queens Stroll Place SE.*

Surveillance footage then captured defendant Asheile Foster arriving on scene in a dark colored Ford Fusion, which parked in front of 5046 Queens Stroll Place SE. Witness 1, a relative of the defendants, emerged from the driver's side of the vehicle. Witness 1 got out of the car and began to cross the street, walking in the direction of 5046 Queens Stroll Place SE.

As Witness 1 stood on the sidewalk in front of 5046 Queens Stroll Place SE, Darren Foster moved deliberately into the middle of the street, strategically positioning himself in close proximity to R.M.'s vehicle. Nearly simultaneously, Antoine Foster walked in the direction of

5

R.M.'s approaching vehicle from the front walkway of 5046 Queens Stroll Place SE and onto the sidewalk next to a parked Chevy Trailblazer.



*Figure 3: Still image of surveillance video of the individuals identified by law enforcement as Darren Foster (left) and Antoine Foster (right) in front of 5046 Queens Stroll Place SE.*

As R.M. drove his white Tesla past defendant Darren Foster, Darren Foster immediately opened fire, extending his arms and aiming directly at the fleeing vehicle. Surveillance footage captured a visible muzzle flash emanating from the firearm as he discharged multiple rounds in the direction of Sergeant McDermott. This was not spontaneous or reckless conduct. Defendant Darren Foster had already taken position in the roadway, waited for the vehicle to approach, and then fired as it passed, demonstrating calculated, targeted action consistent with an ambush.

6



*Figure 4: Still image of surveillance video of subject in the black jacket with stripes (subsequently identified as Darren Foster) in a shooting stance firing what appears to be a firearm.*

Just prior to Darren Foster opening fire on the white Tesla, defendant Asheile Foster, wearing a white or light-colored hoodie, emerged from the dark colored vehicle and walked directly into the path of R.M.'s approaching Tesla. R.M. was forced to swerve to avoid striking him as Asheile Foster aggressively advanced toward the vehicle and attempted to kick it, further escalating this already dangerous encounter.

Immediately after the white Tesla passed Asheile Foster and Darren Foster, defendants Darren and Asheile Foster crossed the street together. With the white Tesla leaving the camera frame, Antoine Foster produced a rifle-style firearm (the AR-15 recovered on scene) raised the

weapon in the direction of the Tesla, and began to run in the direction of the fleeing vehicle. After pointing the firearm towards the Tesla, Antoine Foster handed the weapon to Asheile Foster.



*Figure 5: Subject in the reddish/brownish in color jacket or sweatshirt and reddish/brownish pants (subsequently identified as Antoine FOSTER) moving in the direction of the Tesla holding a weapon with both hands.*



*Figure 6: Subject in white hoodie (subsequently identified as Asheile FOSTER) taking possession of rifle-style firearm from subject in the reddish/brownish clothing (subsequently identified as Antoine FOSTER).*



*Figure 7: Subject in white hoodie (subsequently identified as Asheile FOSTER) in possession of rifle-style firearm.*

Armed with the rifle, defendant Asheile Foster opened fire, discharging multiple rounds at R.M. as he drove away trying to escape the onslaught. Surveillance footage captured muzzle flash and small puffs of smoke emanating from the firearm as Asheile Foster continued firing the direction of the fleeing vehicle. It was from this location that numerous expended shell casings were later recovered, including .300 blackout casings which were preliminarily linked to the AR-15 style rifle law enforcement later recovered from the rear of 5046 Queens Stroll Place SE, further confirming both the weapon used and the intensity of the attack.



*Figure 8: Subject in white hoodie (subsequently identified as Asheile FOSTER) in shooting stance holding what appears to be a rifle-style weapon.*

After opening fire, all three individuals walked towards the front door of 5046 Queens Stroll Place SE, disappearing into their house that day. This rapid return to their home following a coordinated shooting further underscores the defendants' joint participation in this offense and is evidence of consciousness of guilt.

The events that brought R.M. to that block—and into the defendants' line of fire—only heighten the seriousness of this offense. Just one day earlier, on March 22, 2026, R.M.'s unit had arrested Asheile Foster (CCN # 26037570) for drug dealing, specifically fentanyl and other controlled substances. Yet within hours of his release, defendant Asheile Foster armed himself with a rifle-style firearm, and participated in a brazen, targeted shooting.

11

On March 23, 2026, defendant Asheile Foster appeared at the Anacostia Park Police Station to recover some of his personal property which was seized during his arrest. At the same time, R.M. was actively investigating the March 20th shooting and seeking to identify Foster's residence to secure a search warrant for the firearm he believed defendant Asheile Foster possessed. R.M. wanted to identify an address so that a search warrant for his residence could be submitted to a judge. Instead, he was met with a coordinated ambush.

R.M. and other members of USPP followed defendant Asheile Foster who was the passenger in the black Ford Fusion driven by W-1. The vehicle contained only two individuals- Foster and the driver. As R.M. traveled along Queens Stroll Place SE somewhere between 51 Street SE & 53rd Street SE the Ford Fusion came to a stop on the side of the road.

Defendant Asheile Foster ran out into the road in front of the Complainant's vehicle and began banging on the hood of the white Tesla to block his path and prevent him from leaving. He wasn't scared or attempting to disengage; he was attempting to stop the officer from escaping.

R.M. swerved around defendant Asheile Foster and attempted to flee, his instinct telling him something was about to happen. His instincts proved correct as Darren Foster opened fire on the Tesla followed by Asheile Foster.  A barrage of shots rang out, and R.M. was struck. Based on his training and experience, the rapid, sustained gunfire seemed consistent to him with a firearm equipped with an automatic conversion device.  As he fled the scene under fire, ambushed from behind, R.M. was unable to see who was shooting at him.

Following the shooting, USPP Investigator Rice ordered the occupants of 5046 Queens Stroll Place SE out of the residence.  Witness 1 was detained, along with Darren Foster and Antoine Foster, both of whom were now wearing different clothing than at the time of the shooting, further evidence of consciousness of guilt. Witness 1 told police they were asked by

12

defendant Asheile Foster for a ride from his residence at 5046 Queens Stroll Place SE to the USPP to pick up his personal property. Once the property was obtained, they drove back to 5046 Queens Stroll Place SE. Witness 1 stated that they observed the Tesla following them and observed some police vehicles on Benning Road and wanted to stop, but defendant Asheile Foster stated "No [relationship redacted] don't stop."

When Witness 1 arrived at the location, Witness 1 stated that they parked the vehicle and defendant Asheile Foster exited the vehicle to confront the driver as to why they were following them. Witness 1 stated that as Witness 1 was walking towards the front of 5046 Queens Stroll Place SE, Witness 1 heard a large number of gun shots. Witness 1 dropped to the ground until the shooting stopped. After the shooting stopped, Witness 1 ran into the house.

On March 24, 2026, law enforcement officers interviewed Darren Foster. At the time of the shooting, defendant Darren Foster was inside 5046 Queens Stroll Place SE when he received a call stating that his family was being followed and was told to come outside. He claimed that when he stepped into the roadway, he was unable to see who was driving due to heavily tinted windows. Defendant Darren Foster initially gave law enforcement a self-serving statement that when he got close, the people in the white Tesla started shooting and that he heard four to five shots. He wasn't sure how many shots he heard, but he estimated it to be 4-5 shots. Defendant Darren Foster was asked how the Tesla opened fire (i.e. did one of the windows come down, etc.) but he couldn't provide an explanation.

That account is flatly contradicted by the evidence. There is no evidence that any law enforcement officer discharged a firearm. After R.M. was discharged from the hospital, a round count was of his duty weapon confirmed that no rounds were missing as the firearm remained fully loaded. Indeed, due to the nature of the ambush, R.M. had little time to do anything other

13

than flee to save his life. Moreover, when confronted with the MPD crime camera footage, Defendant Darren Foster identified himself in the surveillance footage. But when further confronted with the same footage showing that individual he identified as himself fired a gun in the direction of the white Tesla, Darren Foster once again gave a self-serving statement, claiming that the individual depicted in the video was not him.

Law enforcement also interviewed Antoine Foster on March 24, 2026.  Antoine Foster advised law enforcement that he lived at 5046 Queens Stroll Place SE and that he was inside the house playing a video game when he heard screaming and gunshots, and Witness 1 came into the house crying.  Antoine Foster was unable to provide police with any details on the shooter. Antoine FOSTER advised that Darren FOSTER might've been in his room upstairs and that the only people home were his sister and mother.  Antoine Foster also provided law enforcement with consent to search his device for information about the shooting, though he claimed there would be no such information in the device.  Law enforcement photographed some recent text conversations and the call log, and pictures and videos were checked, but there was no immediately obvious evidence pertaining to the shooting.  Law enforcement then released Antoine Foster and he was sent on his way.

On March 24, 2026, law enforcement obtained a residential search warrant from the Superior Court of the District of Columbia for 5046 Queens Stroll Place SE.  On the same date, at approximately 1:58 p.m., members of MPD, ATF, and USPP executed the search. As mentioned above, the aforementioned backpack in the rear of the residence revealed a Diamondback DB-15 (marked "Cal. Multi") AR-15-style rifle with no stock.  The DB-15 had 15 rounds of .300 blackout caliber ammunition in the magazine and one round in the chamber.  The ammunition seemingly matched the casings found at the scene of the shooting. The firearm had

a capacity to hold 60 rounds. The backpack containing the AR-15 style rifle was recovered from a small space behind the fence at the rear of 5046 Queens Stroll Place SE.



*Figure 9: Recovery of backpack containing AR-15 style rifle from the rear of 5046 Queens Stroll Place SE.*

A search of the attic revealed a Glock 19, 9mm pistol with a magazine which extended beyond the bottom of the magazine well. The Glock 19 was loaded with 17 rounds of 9mm ammunition in the magazine and one round in the chamber. The ammunition seemingly matched the casings found at the scene of the shooting. The firearm had a capacity to hold 31 rounds

In addition to other items of evidence, law enforcement also recovered an AR-15 style apparent 3D printed lower receiver from the first-floor bedroom and multiple firearms magazines, additional ammunition of multiple calibers (including 9mm and .300 blackout), as

15

well as clothing which appeared to match the clothing worn by defendant Darren Foster during the shooting. A hooded sweatshirt like the one which appears to have been worn by defendant Asheile Foster, both while collecting his property from USPP as well as during the shooting, was recovered. Within that sweatshirt, an arrest bracelet with defendant Asheile Foster's name and associated identifiers on it was recovered.



*Figure 10: Hooded sweatshirt recovered by law enforcement similar to the one which appears to have been worn by defendant Asheile Foster while collecting his property from USPP.*



*Figure 11: Diamondback DB-15 (marked "Cal. Multi") AR-15-style rifle recovered from backpack at rear of residence.*



*Figure 12: Glock 19, 9mm pistol with a magazine recovered from attic of residence.*

**ARGUMENT**

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). When determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. *See* 18 U.S.C. § 3142(g).

In making the pretrial detention determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device. *See Smith*, 79 F.3d at 1210 and *Williams*, 798 F. Supp. at 36.

The Government seeks detention pursuant to 18 U.S.C. §§ 3142(f)(1)(A) (crime of violence) and 3142(f)(1)(E) (felony involving possession of a firearm).  The facts and circumstances in this case demonstrate that there are no conditions or combination of conditions that would assure the safety of the community or the defendant's return to Court should he be released.  *See* 18 U.S.C. § 3142(e)(1).  Here, three of the four § 3142(g) factors favor detention

pending trial, including: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  The third factor, the defendant's history and characteristics is neutral.

Additionally, in this case the defendant is subject to the rebuttable presumption of detention under 18 USC. § 3142(e)(3) as there is probable cause to believe he committed a qualifying crime of violence. The grand jury's return of an indictment alone establishes probable cause and triggers the presumption. Once triggered, the presumption reflects Congress's determination that defendants charged with serious violent offenses pose a heightened risk of both danger to the community and nonappearance. It does not disappear when rebutted, it remains a factor to be weighed among the § 3142(g) factors.

## I.      The Nature and Circumstances of this Offense Merits Detention.

The nature and circumstances of this offense weigh overwhelmingly in favor of pretrial detention. This case involves a violation of 18 USC §§ 111(a), (b) and 924(c)(1)(A)(iii), a crime of violence in which the defendants shot a law enforcement officer. Assaulting a federal officer is serious; shooting a law enforcement officer elevates the conduct to its most dangerous form. Here the defendants did not merely resist or evade law enforcement, they used firearms to inflict potentially lethal force on an officer performing their official duties.  And Antoine Foster was instrumental in that conduct by bringing an AR-15 style rifle outside to ambush R.M.

The danger posed by this conduct cannot be overstated. Firing a weapon at a law enforcement officer reflects a complete disregard for human life and the rule of law.  Even the "best case" scenario in such violent encounters place victims at extreme risk of death or serious bodily injury.  Here, the defendants escalated the encounter to gun violence, creating the exactly

the kind of grave and ongoing danger that the Bail Reform Act is designed to prevent. The defendants were not scared, they did not flee, de-escalate or attempt to avoid confrontation. Instead, they lay in wait, advanced on R.M.'s vehicle, positioned themselves to inflict deadly harm, and opened fire. The volume of gunfire—over 30 rounds—confirms what the evidence already makes clear: the defendants shot to kill.

Even if the defendants did not know that R.M. was a law enforcement officer, this is a distinction without a difference. The law does not recognize such a distinction.  *See United Staes v. Feola*, 420 U.S. 671, 684 (1975) (holding there is no requirement that an assailant be aware that the victim is a federal officer). On the face of the defendants' conduct alone, this crime presents an extraordinary danger to the community.

First, one of the guns used in this case was a stolen AR-15. Unlike a typical handgun, an AR-15 is a high-velocity semi-automatic weapon designed to fire rounds at speeds that cause catastrophic injury. The rounds fired from such a weapon travel at such a velocity that they can fragment and cavitate upon impact, dramatically increasing the likelihood of severe trauma or death. This is not a weapon of impulse or proximity, it is a weapon capable of inflicting mass casualties in seconds.  When Antoine Foster armed himself with a stolen AR-15 style weapon to accompany Darren Foster as they waited to ambush R.M., he brought with him a weapon of war.

Second, the evidence shows that Darren Foster was the first of the defendants to fire at R.M. as the officer was simply trying to flee the area.  Antoine Foster then began to advance in the direction of R.M.'s vehicle, raising the AR-15 style rifle in R.M.'s direction, before handing the rifle to Asheile Foster.  And when defendant Ashelei Foster chose to fire the AR-15 in the manner that he did, he displayed the specific intent to kill.

Third, this deluge of gunfire was planned, coordinated and executed on a residential street,

right out in the community, less than 1,000 feet from an elementary school at 7:30 p.m. on a spring, Monday evening.  The defendants' actions placed the surrounding community in immediate harm. This alone demonstrates the danger that the defendants pose to the community.

Finally, the defendants had an arsenal of illegal weapons and ammunition stored in their home, including an additional 32 rounds of .300 blackout rifle ammunition, 30 rounds of .45 caliber ammunition and approximately 64 rounds of 9mm ammunition. This, coupled with their actions on the date of the offense, establishes the danger the defendants pose to the community. The defendants, through their actions together, have established that they are not only willing to engage in extreme violence but had the means to do so as well.

The nature and circumstances of this offense weigh heavily in favor of pre-trial detention. The defendants' willingness to spray gunfire down a residential street at a law enforcement officer represents an exceptionally serious form of violence.  This case does not involve the mere possession or brandishing of a firearm, rather the defendants engaged in coordinated and escalating gunfire directed at a law enforcement officer.  Nor were the defendants' actions a momentary lapse in judgment.  Rather their actions involved deliberate, escalating violence reflecting a complete disregard for the safety of others and confirming that no condition or combination of conditions can reasonably assure the safety of the community.

## II.    The Weight of the Evidence Against the Defendants Favors Detention.

The second factor to be considered—the weight of the evidence—overwhelmingly favors detention.  The Government's case is not circumstantial or speculative; it is direct, corroborated and compelling.[1]   The entire shooting is captured on surveillance footage, documenting the

---

[1] Here, the weight of the evidence should be considered equally with the other § 3142 factors.  In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not

defendants coordinated actions before, during, and after the attack. The video evidence alone is powerful. But it is not the only evidence implicating the defendants in their attack on R.M.

The defendants are identified through multiple independent sources, including video surveillance, witness statements, and physical evidence recovered at the scene. Firearms consistent with those used in the shooting and preliminarily linked to the shooting by National Integrated Ballistic Information Network Leads were recovered along with numerous shell casings. The defendants' clothing observed in the video is consistent with what was recovered, further linking them to the offense.

The sequence of events captured on surveillance video leaves no ambiguity. The defendants positioned themselves in advance, confronted the victim's vehicle, and opened fire as R.M. attempted to flee. Asheile Foster fired first with a handgun. Antoine Foster escalated the attack by deploying a rifle, which he then gave to Asheile Foster who directed a hail of gunfire down the street towards R.M.'s vehicle. This was a coordinated ambush, not a spontaneous encounter. The volume of gunfire—over 30 rounds—confirms the sustained and intentional use of lethal force by the defendants.

Equally significant are the defendants' own statements. Defendant Darren Foster provided shifting, internally inconsistent accounts when interviewed by law enforcement. He initially claimed that the occupants of the Tesla fired first, a claim directly contradicted by both video

---

automatically be weighed less than the remaining statutory pretrial detention factors." 2023 U.S. Dist. LEXIS 18988, at *29-30. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). Moreover, the Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight.

evidence and physical evidence showing that R.M.'s firearm was never discharged. When confronted with video surveillance showing him in the roadway, Darren Foster admitted his presence in the roadway. But when confronted with footage showing the shooter firing at the vehicle, Defendant Darren Foster changed his account again and denied being the individual being depicted. Antoine Foster claimed that he was not involved in the shooting at all. But this claim is not supported by the evidence.

23



25

████████████████████████████████████████████████████████████████

██████████████████

    ████████████████████████████████████████████████████

█████████████  ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████  ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████



*Figure 13: Still shot from MPD crime camera at 19:30:58 hours.*

26

The strength of the government's case is underscored by consistency across all forms of evidence: video, physical evidence, and witness observations all tell the same story. The evidence is mutually reinforcing and points directly to the defendants' guilt. "[I]f the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *29-30. So it is in this case: the weight and strength of the evidence increase the prospect that Defendant will present a danger to the community if released.

## III.    Defendant's History and Characteristics are Neutral.

The third factor, the history and characteristics of the defendant is neutral. Although Antoine Foster may point to a lack of prior criminal history, that fact does not mitigate the danger he poses—in fact, it underscores it. The defendant has now demonstrated a willingness to engage in extreme, unprovoked violence directed at a law enforcement officer. Antoine Foster played a critical role in the implementation of the defendants' ambush of R.M. He armed himself with a weapon of war which he pointed in the direction of R.M.'s fleeing vehicle before handing that weapon to Asheile Foster, who proceeded to spray 23 rifle caliber rounds towards R.M. And following the shooting, Antoine Foster sought to hide the AR-15 rifle in a backpack which he concealed behind 5046 Queens Stroll Place SE. This was not impulsive, low-level misconduct; it was a deliberate decision to use lethal force.

Courts have recognized that a defendant's lack of a prior criminal record does not outweigh clear evidence of present dangerousness, particularly where the charged conduct itself is extraordinarily violent. *See United States v. McAbee*, 628 F. Supp. 3d 140, 154 (D.D.C. 2022)

(finding defendant's history and characteristics were a neutral factor in determining whether pretrial detention was warranted where defendant's lack of criminal history, lack of prior dangerousness or violence, and employment weighed in his favor, but his law enforcement background, video evidence capturing him entering the Capitol building with a weapon, and allegations that he had a physical and violent engagement with law enforcement officers weighed in favor detention); *see also United States v. DeGrave*, 539 F. Supp. 3d 184, 207 (D.D.C. 2021) (explaining that "a record of violence or dangerousness . . . is not necessary to support pretrial detention and the absence of such a record is not determinative on the issue of danger to the community"). Here, the defendant's history is less probative than his conduct in this case—which reveals a capacity for violence that cannot be ignored.

Nor do any asserted ties to the community, employment or lack of prior convictions meaningfully reduce that risk. Those same factors existed at the time of the offense and did nothing to deter the defendant from engaging in life threatening conduct. The Court should not credit a previously clean record over the defendant's demonstrated willingness to engage in reckless, criminal conduct that significantly endangers the community.

In short, although the defendant lacks any criminal history, his actions in this case establish a level of dangerousness that no condition or combination of conditions can reasonably mitigate.

## IV.     The Defendant Presents a Danger to Our Community.

The fourth and final factor—danger to any person or the community posed by the defendant's release—similarly weighs in favor of detention. The D.C. Circuit has noted that "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community," pretrial detention is available to "disable the arrestee from executing that threat." *United States v. Munchel*, 991 F.3d 1273,

1280 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). This factor requires the Court to make a "forward looking determination" about the defendant's risk of danger to the community, keeping in mind that detention may be justified even if the Court does not explicitly find that the defendant is a risk of committing acts of violence. *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021) (citing *Munchel*, 991 F.3d at 1283).

The defendants present an acute and ongoing danger to the community that no condition or combination of conditions can mitigate. This case is not about isolated or impulsive conduct, it is about coordinated, escalating violence, carried out with firearms in a residential neighborhood. Together, the defendants positioned themselves to ambush R.M.'s vehicle and unleashed a sustained barrage of gunfire at R.M. with a 9mm pistol and a rifle-style weapon capable of inflicting catastrophic harm. This was a deliberate ambush, executed in concert, and directed at a fleeing victim.

The defendants have shown a willingness not just to possess firearms, but to use them repeatedly and in a sustained manner to endanger the life of a law enforcement officer and other members of the community. The defendants did not retreat, de-escalate or disengage. Their conduct was not defensive. The defendants had multiple safe, lawful alternatives they could have pursued prior to shooting at R.M. They could have alerted law enforcement or simply returned to their residence. Instead, they chose to confront R.M. and repeatedly shoot at him, engaging in purposeful violence with a complete disregard for the safety of human life.

The danger extends beyond the immediate victim. The defendants discharged more than 30 rounds on a residential street, less than 1,000 feet from a school, placing bystanders at risk of death or serious bodily injury. The introduction of a rifle into the encounter—after the initial shots were fired—demonstrates not only coordination but a willingness to escalate violence mid-incident

to increase lethality. That capacity for violence makes them uniquely dangerous.

Further, the defendants conduct both before and after the shooting confirms that the danger is ongoing. They armed themselves with high-powered weapons that were stored in their own residence, coordinated their actions, and then retreated together to a shared location. After the shooting Darren Foster and Antoine Foster changed clothing. This is not the behavior of individuals who can be trusted to comply with court-ordered conditions, it is the behavior of individuals who are willing to evade accountability.

In sum, the defendants demonstrated a willingness to engage in coordinated armed violence, the capacity to escalate that violence using high-powered firearms, and a complete disregard for lawful alternatives to avoid harm. On this record, there is no condition or combination or combination of conditions that can reasonably assure the safety of the community.

## CONCLUSION

The Government respectfully requests that the Court issue an Order granting its motion that Antoine Foster be held without bond pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   */s/ Benjamin Helfand*
Benjamin Helfand
D.C. 1658708
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, D.C. 20530
Phone: 202-252-7059
Email: Benjamin.Helfand@usdoj.gov